**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER STOTTS, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 2:11-CV-519** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **STEVEN S. PIERSON, et al.,** | : | |
| | : | **Magistrate Judge King** |
| **Defendants.** | : | |
| | : | |

## OPINION & ORDER

This matter is before the Court on the Motion of Plaintiffs Demetrios Prokos and

Christopher Stotts (collectively "Plaintiffs") for Partial Summary Judgment, (Doc. 48), the

Motion of Defendants City of Athens ("Athens" or the "City") and Steven Pierson (collectively

the "City Defendants") for Summary Judgment, (Doc. 50), and the Motion of Defendants

Michelle Drabold, Hector Flores, John Golzy, Roger Grueser, Betty Hollow and Greg Levelle

(collectively the "BZA Defendants") for Summary Judgment, (Doc. 49).   For the foregoing

reasons, Plaintiffs' Motion is **DENIED**, the City Defendants' Motion is **GRANTED** in part and

**DENIED** in part, and the BZA Defendants' Motion is **GRANTED** in part and **DENIED** in part.

Claims against Defendants Hollow, Lavelle, Golzy, and Drabold in their individual capacities are

**DISMISSED**.

## I. BACKGROUND

### A. Factual Background

Plaintiff Demetrios Prokos ("Prokos") is the owner of a property located at 9, 11, and 13

West Stimson Avenue in Athens, Ohio (the "Property").  (*Stips.,* [1] Doc. 41, ¶ 1.)  At all times

---

[1] This refers to the parties' joint stipulations of fact and attached exhibits.

relevant to this action, the use of the Property was governed by Chapter 23 of the Athens City Code ("Zoning Code" or "A.C.C."). (*Id*. at ¶ 8.) Specifically, the Property is located within an area zoned "B-3," as defined in Zoning Code, (*id*.), which permits the following uses (among others): "Entertainment - - Night clubs, theaters, billiard parlors, pool halls, bowling alleys, and similar enterprises…" Zoning Code §§ 23.04.07, 23.04.06. The Property is more than 100 feet away from any residential zone, and less than 200 feet from several actual residences. (*Stips.*, Doc. 41, ¶ 8.)

### 1. First and Second BZA Decisions

On November 12, 2007, Prokos entered into an agreement to lease the Property to Plaintiff Christopher Stotts ("Stotts") d/b/a Three Wide Entertainment, an adult entertainment business, effective upon the City's issuance of a Use Permit. (*Id*. at ¶¶ 2, 4, Ex. 1.)  Under this Agreement, Prokos was to receive up to 40% of the gross revenue of the adult entertainment establishment.  *Id*.

On December 17, 2007, Stotts submitted to the City an Application for a Zoning Certificate/Use Permit ("First Application"), proposing to make primary use of the Property as a "private club/assembly hall" for "dancing and entertainment without sale of alcohol and 120 fixed seats, all within existing building footprint." (*Id*., ¶ 9, Ex. 3.)  At the time, Defendant Steven Pierson ("Pierson") was the City's Director of the Department of Development, Enforcement & Facilities and the City's Zoning Administrator. (*Id*. at ¶ 4.)[2]  Shortly after filing the First Application, Stotts verbally disclosed to Pierson that he intended to offer adult entertainment with live dance performances at the Property. (*Id*. at ¶ 10.)

On January 15, 2008, Pierson issued a written response to Stotts on behalf of the City. The response stated, in relevant part:

---

[2] Pierson is no longer employed with the City in any capacity.

2

> ...I am unable to determine if the proposed use and the number of parking spaces is permitted under Athens City Code, Title 23, Zoning Code. Therefore, in accordance with the Athens City Code Sections 23.04.07(A)(12) and 23.07.02(C), I am referring this matter to the Athens City Board of Zoning Appeals. The referenced sections permit the Board to review the application to determine if it is of the same general character as specifically listed permitted uses and to determine the number of parking spaces required for a use where the minimum number of parking spaces is not specifically listed in Athens City Code Section 23.11, Table "B", Off-Street Parking Requirements.

(*Id*. at ¶ 11, Ex. 4.)

Following Pierson's letter, on March 11, 2008, the Athens City Board of Zoning Appeals (the "BZA" or "Board") held a hearing on the First Application. Defendants Betty Hollow, Roger Grueser, Greg LaVelle, John Golzy, Michelle Drabold, and Hector Flores comprised the membership of the BZA at all times relevant here. (*Id*. at ¶ 5.)[3] After considering the evidence and arguments presented at the first hearing, and without reaching the question of parking spaces, (Doc. 41-4 at 83), the BZA determined that the B-3 zone did not permit Stotts' proposed use and unanimously denied the First Application. (*Id*. at 88.) Subsequently, on March 25, 2008, the BZA issued a written decision memorializing its denial of the First Application ("First BZA Decision"), which stated:

> On the Motion of Mr. Golzy, seconded by Ms. Hollow, the Board voted to consider the proposed use of the property located at 11-13 West Stimson Avenue as principally permitted in a B-3 zone in accordance with Sections 23.04.07(A)(12) and 23.07.02(C) of the Athens City Zoning Code. Upon vote, the motion failed 5-0.

(*Stips*., Doc. 41, ¶ 14; Doc. 41-7.)

On March 14, 2008, three days after the BZA hearing on the First Application, Stotts submitted three new Use Permit applications (the "Second Applications"), which respectively listed the Property's proposed primary use as "Entertainment," "Night Club," and "Theater." (Doc. 41-6.) The longer description of the proposed use, however, was the same in all three

---

[3] Grueser and Flores are no longer members of the BZA.

applications: "Operation of a sexually oriented business and/or adult cabaret and/or adult theater with sexually oriented entertainment activity for patrons over age 18 without sale or service of alcohol, with a maximum of 180 fixed seats, all within the existing building footprint, w/ 4800 sq. ft. available for customer use." (*Id.*) Pierson issued a written response denying the Second Applications ("Pierson's Response to Second Application").[4]  (*Stips.*, Doc. 41,  ¶ 15.)

Stotts appealed, and – in a hearing on May 13, 2008 – the BZA unanimously affirmed Pierson's decision and rejected the Second Applications.  *(Id.* at ¶¶ 16, 18.)  On June 9, 2008, the BZA issued a written decision memorializing its denial of the Second Applications (the "Second BZA Decision"), stating:

> After due consideration of all the relevant information presented at the meeting on May 13, 2008, the Board finds by a vote of 5-0 that the zoning administrator did not err in refusal to Application Nos. 08-0377, 08-038 and 08-39 to permit establishment of an adult entertainment business, an adult theatre and an adult nightclub at 11 and 13 West Stimson Avenue.

(*Id.* at ¶ 19; Doc. 41-10.)

### 2. First Common Pleas Decision

Pursuant to Ohio Revised Code § 2506, Stotts timely appealed the First and Second BZA Decisions to Athens County Common Pleas Court, Case Nos. 08CI-0145 and 08CI-0277, and the cases were consolidated. (*Stips.*, Doc. 41, ¶ 20.) In a written opinion dated June 1, 2010 ("First Common Pleas Decision"), the court found that "the hearing transcripts cast serious doubt on whether all Board members fully understood and applied the correct legal standards to the issues," and vacated the First and Second BZA Decisions. *See* Doc. 41-10.  Specifically, the First Common Pleas Decision explained:

> The two hearing transcripts from 3-11-08 and 5-13-08), read as a whole show that the Board was presented with two issues.  First, did Appellants' proposed use fit within the meanings of certain principal permitted uses already listed in the Code

---

[4] The parties have been unable to locate a copy of that letter.

> – i.e., "nightclub," theater," "entertainment" business. See ACC 23.04.07(A0 and 23.04.06(A). Second, if not, then was the proposed use at least "of the same general character" as any listed principal permitted use?  See ACC 23.04.07(A)(12).

(*Id*. at 6.)

Upon reviewing the BZA hearing transcripts, the First Common Pleas Decsion found numerous instances in which BZA members appeared to misunderstand the principles governing their inquiry, including:  (1) failure to consider the "same general character" issue; (2) various members' "surprise and reluctance that the Board would be handling anything other than variances, apparently disagreeing with, or not understanding, the Board's authority to decide principal permitted use issues;" (3) suggestions that the application "could or should be denied simply because it involved 'immorality'"; (4) suggestions that the Board's role was to assess the similarity of the proposed use "to existing, planned or hoped for businesses/uses" in the area, or consider what was "appropriate for the community;" and (5) members' reference to and application of standards related to granting variances. (*Id*. at 7-9.) As the court explained, however, "City Council, by adopting a zoning code, already determined what is appropriate for B-3 and B-2D Zones," and any concerns about the secondary effects of adult entertainment would need to be "addressed by legislative action of City Council, and not by the Board." (*Id*. at 8, 10.)

Accordingly, "the Board's sole duty job was not to determine if Appellants' proposed type of entertainment enterprise is appropriate for the community, but simply determine whether, either directly or under the "same general character" test, it is a principally permitted entertainment enterprise within the meaning of ACC 23.04.07(A)."  (*Id*. at 9.)  The court also noted that "Municipal action that wholly suppresses, or greatly restricts access to, lawful First Amendment activity is constitutionally suspect," and thus reasoned that "from a constitutional

5

standpoint … stripping and exotic dancing establishments must have been permitted somewhere in the City pursuant to the ordinances governing at the time of Appellants' applications." (*Id*. at 13-14) (citing *Union Twp. Bd. Of Trustees v. Old 74 Corp*., 738 N.E.2d 477, 484-85 (Ohio App. 2000); *Young v. Am. Mini Theaters, Inc*., 427 U.S. 50, 71 n.35 (1976)).  Based on the above, the First Common Pleas Decision vacated the BZA's decision and remanded to the BZA for reconsideration consistent with its opinion.

The Board appealed the First Common Pleas Decision to the Ohio Court of Appeals. Finding that the court applied the correct legal standard, the Ohio Court of Appeals affirmed the decision below ("Court of Appeals Decision"). *Three Wide Enter't v. City of Athens Bd. of Zoning Appeals*, 954 N.E.2d 191 (Ohio App. 2011).

### 3. Third BZA Decision and Second Common Pleas Decision

On remand, the BZA conducted a third hearing on June 14, 2011 and again upheld the denial of the applications ("Third BZA Decision").  (*Stips.*, Doc. 41, ¶ 24.)  Stotts again appealed to the Athens County Common Pleas Court.  In an opinion dated November 23, 2011 (the "Second Common Pleas Decision"), the Court of Common Pleas reversed and remanded the Board's decision. (Doc. 41-13 at 15.) Specifically, the court found that the Board erred as a matter of law when it decided that Property's proposed use as a nude or exotic dancing establishment did not "meet the definition of a 'nightclub' or 'theater.'" (*Id*. at 10.) The court also found that the Board erred as a matter of law in concluding that "the proposed use was not at least 'of the same general character' as any principal permitted use." (*Id*. at 13.) Although the court based its conclusions on the plain language of the Zoning Code, the court noted that its interpretation of the applicable provisions avoided potential constitutional problems arising from a whole or outright ban on adult entertainment businesses in all locations.  (*Id*. at 11, 7 n.5)

6

(citing *Union Twp. Bd. Of Trustees v. Old 74 Corp.*, 738 N.E.2d 477, 484-85 (Ohio App. 2000);

*Wooster v. Entertainment One, Inc.*, 814 N.E.2d 521 (Ohio App. 2004)).   The court nevertheless

expressly "refrain[ed] from ruling on the constitutionality of the Board's decision," because

"Appellants [had]… expressly waived this Court's determination of such issues, presenting them

instead in a related Federal District Court proceeding." (*Id.* at 9.)  In light of its conclusions

regarding the meaning of the terms "nightclub," "theater," "similar enterprises," and "same

general character," the court found the Board's decision to be "unlawful, unreasonable, and

unsupported by the preponderance of the substantial, reliable  and probative evidence." (*Id.* at

15.) The court declined to rule on the question of "whether the City zoning administrator acted in

a timely fashion." (*Id.*) Neither party appealed the Second Common Pleas Decision.  (*Stips.*, Doc.

41, ¶ 28.)

### 4. Third Common Pleas Decision

Following the Second Common Pleas Decision, the parties traded a series of letters in

which Plaintiffs demanded that the City grant the Use Permit, and the City refused, ostensibly on

other grounds.  (*Id.* at ¶¶ 29-33.)  Specifically, in a letter dated January 5, 2012, the Zoning

Administrator indicated that Plaintiffs' Use Permits would be issued only "upon receipt of the

State of Ohio, Division of Industrial Compliance, Building Department approved plans," and

"[a] detailed site plan … to verify the number of parking spaces."  (Doc. 41-15.)  Plaintiffs'

position, as articulated in a letter to the City's counsel dated January 18, 2012, is that the City

was "attempting to withhold the zoning permits from Three Wide on the basis of parking

regulations never before raised or questioned by the BZA," which Plaintiffs "interpreted as

nothing more than attempt to … deter [Plaintffs] from exercising [their] protected First

Amendment rights." (Doc. 41-16 at 1.)  Plaintiffs asserted that they had submitted all necessary

site plans, including parking, with the permit applications. (*Id.*; *see also* Doc. 41-17.)  In a letter

dated January 26, 2012, the City reiterated its position, explaining:

> All three applications … state that there are 58 existing parking spaces on site. I
> went into detail about the number parking spaces required in my last letter, to
> simplify, I do not believe parking will be a problem, but the actual number will
> have to be verified. This can be best done by indicating on the site plan that will
> accompany the drawings submitted to the State of Ohio, Division of Industrial
> Compliance, Building Department. Upon approval of these plans submitted to the
> State of Ohio, a "Use or Zoning" permit will be issued by the City of Athens. This
> policy of not issuing a "Use or Zoning" Permit without State approved drawings
> has been and still is a policy executed by the Code office for years. This process is
> done so that a verification of the proposed construction approved by the State of
> Ohio is in accordance with the plans submitted and approved by the City of
> Athens.

(Doc. 41-18 at 1-2.)

Having reached a stalemate, Plaintiffs filed a Motion to Compel and/or For Contempt and

For Sanctions with the Athens County Common Pleas Court, Case No. 11CI-0186, on the basis

that the City's failure to issue the Use Permits violated the Second Common Pleas Decision.

(Doc. 41-19.) The motion asked the court to order the City to issue the permits. In an Order dated

March 16, 2012 ("Third Common Pleas Decision"), the court denied the motion, explaining that

although the Second Common Pleas Decision prevented the City from denying a Use Permit "on

the basis that the expected use is a theater or a night club," it "d[id] not consider other

requirements, including plans acceptable to the State building authorities and requirements like

parking, building height, etc."  (Doc. 41-20 at 1.) The Third Common Pleas Decision reiterated,

however, that Plaintiffs' adult entertainment use "[wa]s not banned, and in fact, … is an

authorized use in the [B-3] zone." (*Id.* at 2.)

### B. Procedural History

Plaintiffs filed this action on June 13, 2011. (Doc. 1.) Plaintiffs assert the following

claims against the City Defendants and the BZA Defendants: (I) Violations the Right to Free

Speech pursuant to the First Amendment and 42 U.S.C. § 1983; (II) Violations of the Right to

Equal Protection of the Laws pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (III)

Regulatory Taking; (IV) Declaratory Judgment that Sections 23.04.07, 23.04.06 and other

relevant provisions of the Zoning Code are unconstitutional on their face and as applied to the

Property under the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution; and

(V) Violations of the Constitution of the State of Ohio, Article I § 11.  (*Second Amend. Compl*.,

Doc. 22.)  Plaintiffs sued former Zoning Administrator Pierson and former BZA members

Grueser and Flores in their official capacities only. (*Id*. at 4-5.)  Plaintiffs sued current BZA

members Hollow, Lavelle, Golzy, and Drabold in both their individual and official capacities.

(*Id*.) Plaintiffs seek both declaratory relief and monetary damages, as well as an award of

reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988. (*Id*. at 19.)

Plaintiffs moved for summary judgment on Claim I (First Amendment) and Claim III

(Regulatory Taking) of their Second Amended Complaint.  (Doc. 48.)  Simultaneously, the City

Defendants (Pierson and the City of Athens) moved for summary judgment on all claims,

asserting that Plaintiffs' claims fail on the basis of standing and res judicata/collateral estoppel,

and that Plaintiffs' equal protection, regulatory takings claims, and declaratory judgment claims

fail on the merits. (Doc. 50.)  Finally, the BZA Defendants moved for summary judgment on all

claims, both on grounds stated by the City Defendants, and on the basis that the BZA

Defendants, in their individual capacities, are entitled to quasi-judicial immunity. (Doc. 49.)

This Court held oral argument at which it heard from all counsel, and these matters are now, ripe

for review.

At oral argument, Plaintiffs agreed to dismiss all claims against Hollow, Lavelle, Golzy,

and Drabold in their individual capacities. Claims against these BZA Members in their individual

9

capacities are, therefore, **DISMISSED** with prejudice, and the Court does not consider them below.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed.  R. Civ.  P.  56(c).  A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). At that point, the non-movant must set forth specific facts showing that there is a genuine issue for trial.  *Id.* (quoting Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.,* 782 F.2d 609, 615 n. 5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. LAW AND ANALYSIS

*A. Res Judicata*

Defendants first argue that Plaintiffs' claims are barred by *res judicata*.  Under the doctrine of *res judicata*, state court judgments are given the same preclusive effect in federal court as they would have received in the courts of the rendering state. *Keymarket of Ohio, LLC v. Keller*, 483 Fed.Appx. 967, 970 (6th Cir. 2012) (citing *ABS Indus., Inc. ex rel. ABS Litig. Trust v. Fifth Third Bank,* 333 Fed.Appx. 994, 998 (6th Cir. 2009)). The party asserting the defense of *res judicata* bears the burden of proof.  *Id.* (citing *Ohio ex rel. Boggs v. City of Cleveland,* 655 F.3d 516, 520 (6th Cir. 2011)).

To determine whether a state would assess a preclusive effect to a particular judgment, federal courts look to the law of the rendering state. *Id*. at 970-71 (citing *Ohio ex rel. Boggs,* 655 F.3d at 519). Under Ohio law, "the doctrine of res judicata consists of the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *Doe ex rel. Doe v. Jackson Local Schools Sch. Dist*., 422 Fed.Appx. 497, 500 (6th Cir. 2011) (quoting *O'Nesti v. DeBartolo Realty Corp.,* 113 Ohio St.3d 59, 862 N.E.2d 803, 806 (2007)) (internal citations omitted).  Claim preclusion "prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action." *Id*. (quoting *O'Nesti,* 862 N.E.2d at 806 (citation omitted)). In addition, claim preclusion "bars subsequent actions whose claims 'could have been litigated in the previous suit[.]'" *Id.* (alterations original) (quoting *O'Nesti,* 862 N.E.2d at 806).  In contrast, "issue preclusion, or collateral estoppel, prevents the 'relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies[,]' even if the causes of action differ." *Id*. (alterations

11

original) (quoting *O'Nesti,* 862 N.E.2d at 806); *see also Fort Frye Teachers Ass'n v. State Emp't Relations Bd.,* 692 N.E.2d 140, 144 (Ohio 1998).

1. *England* Reservation

At oral argument on the motions *sub judice,* Defendants' counsel clarified the subject of Defendants' *res judicata* arguments as follows:

> [W]e're not saying [Plaintiffs] waived their federal constitutional claims because I respect they filed the *England* reservation, and I understand that doctrine. But when the underlying factual predicate of each of your federal constitutional claims is an allegation that you're entitled to a zoning permit and the state court in a final, valid judgment has ruled against you, those claims are barred by res judicata. And that's the essence of our argument.

*Oral Arg. Tr.*[5]

An *England* reservation, named for the Supreme Court's decision in *England v. La. Bd. Of Med. Exam'rs*, 375 U.S. 411 (1964), permits a plaintiff in certain state court actions to reserve federal claims for subsequent review in a federal forum. *England* considered a matter in which a federal court abstained from hearing chiropractors' constitutional challenge to a state law setting educational requirements for medical practitioners. The plaintiff chiropractors then took both their state and federal claims to state court, where they were unsuccessful. *Id.* at 414. When the plaintiffs again asked a federal court to hear their constitutional claims, the action was dismissed on grounds that the district court had no authority to review the state court's resolution of the federal claims. *Id.* The Supreme Court reversed, holding that the plaintiffs should have had the opportunity to reserve their federal claims in the state court action, such that they were preserved for federal review once the state law issues were resolved. *Id.* at 421-22.

The Sixth Circuit has extended *England* beyond cases of federal abstention, in order to permit a plaintiff to reserve federal claims – and thereby avoid claim preclusion – in cases where

---

[5] This refers to the transcript from the Oral Argument held on September 19, 2013.

the plaintiff is procedurally obligated to bring an initial state court action. *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 523, n.9 (6th Cir. 2004) (given that state court action is a condition precedent for ripeness of a federal takings claim, claim preclusion does not bar subsequent federal takings action where plaintiff reserved federal claims in the state court proceeding) (favorably citing *Dodd v. Hood River County*, 59 F.3d 852, 862 (9th Cir. 1995) (implicit consent by defendants to claim-splitting and reservation by state courts is sufficient to reserve the claim for federal determination; issue preclusion still applies)).  Here, in order to avoid *res judicata* as to the BZA's interpretation of the Athens Zoning Code, Plaintiffs were obligated to appeal the First and Second BZA Decisions. *See Grava v. Parkman Twp.*, 653 N.E.2d 226, 229 (Ohio 1995) (decision of a zoning board of appeals has preclusive effect as to matters within its jurisdiction). Thus, Plaintiffs "could not have chosen to file a federal action first encompassing both [their] state and federal law claims." *DLX, Inc.*, 381 F.3d at 521.  Accordingly, the case *sub judice* is of the type where an *England* reservation in the prior state court action may preserve federal claims for review in federal court.[6]

A review of the record indicates that Plaintiffs did, in fact, expressly reserve their federal claims when appealing the First and Second BZA Decisions to the Court of Common Pleas.  (*See Second Common Pleas Decision*, Doc. 41-13 at 9) (refraining from "ruling on the constitutionality of the Board's decision" because "Appellants … expressly waived this Court's determination of such issues, presenting them instead in a related Federal District Court

---

[6] In *Perry v. Croucher,* 165 F.3d 28 (Table), 1998 WL 661151 (6th Cir. Aug. 31, 1998), the Sixth Circuit held that, because "[u]nder Ohio Revised Code § 2506.04, the court of common pleas has authority to hear constitutional challenges to an administrative determination," *id.* at *5 n.11, a claimant who simultaneously pursues actions in federal and state court does "r[u]n the risk of being 'vulnerable to a defense based on res judicata.'" *Id.* in *6 (quoting *Button v. Harden,* 814 F.2d 382, 384 (7th Cir. 1987)). In *Perry*, however, the plaintiff had made no *England* reservation waiving his federal claims in the state court action.

proceeding"). Thus, claim preclusion does not bar those claims here.[7] As such, to the extent Defendants seek summary judgment on the basis of claim preclusion, the City and BZA Defendants' Motions are **DENIED**.

## 2. Issue Preclusion

Although claim preclusion does not apply in the matter *sub judice*, Defendants argue that decisions in state court actions below decided "underlying factual predicate[s]" of plaintiffs' claims in a manner that forecloses those claims. *Oral Arg. Tr*. Although Defendants sometimes use the language of claim preclusion in making this argument, it is properly viewed as a question of issue preclusion. Under Ohio law, the "doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." *Fort Frye Teachers Ass'n*, 692 N.E.2d at 144 (citing *Norwood v. McDonald*, 52 N.E.2d 67 (Ohio 1943); *Trautwein v. Sorgenfrei*, 391 N.E.2d 326 (Ohio 1979); *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978 (Ohio 1983)). Issue preclusion applies when "the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994); *Wenglor Sensors, Ltd. v. Baur*, 847 F.Supp.2d 1041, 1045 (S.D. Ohio 2012).

---

[7] Defendants do not argue that Plaintiff's Ohio constitutional claims are subject to claim preclusion in light of the prior state court action. Rather, they argue that the Third Common Pleas Decision decided an issue in a manner that destroys an element of that claim. Thus, the Court does not now consider the effect of Plaintiffs' *England* reservation on the Ohio constitutional claims. *See DLX, Inc.*, 381 F.3d at 520 n.4 ("[R]es judicata is not a jurisdictional issue but an affirmative defense.").

Defendants assert that several critical issues and facts already decided below are determinative with respect to Plaintiffs' claims.  First, Defendants assert that – in denying Stotts' Motion for Contempt and Sanctions – the Third Common Pleas Decision decided that, because Plaintiffs failed to satisfy certain generally applicable regulations with respect to state-approved building plans, the City had a valid independent basis for denying Plaintiffs' Use Permit. This issue, Defendants argue, is dispositive as to whether Plaintiffs have standing in this action, as well as whether Plaintiffs can succeed as to Count I (§ 1983 Free Speech), Count III (Regulatory Takings), Count IV (Declaratory Judgment), and Count V (Ohio Const. Art. I, § 11) of the Second Amended Complaint. Defendants' argument in this regard fails because the Third Common Pleas decision did not actually "pass upon" the question of whether Plaintiffs had failed to satisfy a valid independent permitting requirement.  Rather, in denying Plaintiffs' motion for contempt and sections, the court merely explained that the Second Common Pleas Decision prevented the City from denying a Use Permit "on the basis that the expected use is a theater or a night club," and "*d[id] not consider other requirements*, including plans acceptable to the State building authorities and requirements like parking, building height, etc." (Third Common Pleas Decision, Doc. 41-20 at 1) (emphasis added).  Nor did the Third Common Pleas decision itself examine whether Plaintiffs had met such other permitting requirements.  Thus, the question of whether Defendants had a valid independent basis for denying Plaintiffs' application is not subject to issue preclusion.

Second, Defendants argue that Plaintiffs' equal protection argument (Count II) is barred by *res judicata*.  Count II of the Second Amended Complaint asserts that Plaintiffs were denied equal protection of the laws on the basis that the Zoning Administrator failed to act on the First Application within 30 days as required by ACC § 23.06.02(G).  Plaintiffs assert that, on other

15

occasions Defendants have automatically granted permit applications not acted upon within 30 days, and that Defendants had no rational basis not to do so in this case. Defendants assert that this claim is precluded because the timeliness of the Zoning Administrator's action was raised in the prior state court proceedings. Again, however, Defendant's argument fails because the issue was not actually "passed upon [or] determined" by the state court. Rather, the Second Common Pleas Decision explained that, in light of the court's holding as to permitted uses under the B-3 Zone, there was "no cause to address Appellants' arguments regarding … whether the City Zoning Administrator acted in a timely fashion." (*Id.* at 15.) Accordingly, there is no issue preclusion as to the question of whether Defendants timely acted on the First Application and/or treated the First Application differently than similarly situated applications.[8]

Finally, Defendants argue that, with respect to Count IV (Declaratory Judgment), Plaintiffs' facial challenge to Sections 23.04.07 and 23.04.06 of the Zoning Code is subject to issue preclusion. Section 23.04.07 governs permitted uses in the B-3 Zone and expressly incorporates B-2D permitted uses found in Section 23.04.06, which include "[n]ight clubs" and "theaters." Whether these provisions included or categorically prohibited adult entertainment venues was extensively litigated by the parties before the court of common pleas. In addition, the Second Common Pleas Decision interpreted the language of the Zoning Code and found that section 23.04.06's reference to "nightclubs" and "theaters" does include adult entertainment venues and nude dancing establishments. (*See Second Common Pleas Decision*, Doc. 41-13, 10-14.) Thus, the Second Common Pleas Decision expressly "passed upon and determined" that adult entertainment establishments were among the uses permitted in the B-3 and B-2D Zones.

---

[8] Although Defendants argue that preclusion applies because the matters "were or could have been litigated" in the state court action, (*Def.'s Mt.*, Doc. 50, 11), this is the standard for adjudging claim preclusion, *not* issue preclusion. As discussed above, because Plaintiffs' federal equal protection claim was preserved through an *England* reservation, claim preclusion does not apply.

Furthermore, the parties to the case *sub judice* were all parties to – or in privity with

parties to – the prior state court action. The parties involved in the Second Common Pleas

Decision included Three Wide Entertainment, Stotts, and the City of Athens Board of Zoning

Appeals.  It is undisputed that the City of Athens, Pierson and the BZA Defendants, in their

official capacities, are privies of the Board of Zoning Appeals.[9]  Moreover, although Plaintiffs

argue that Prokos is not properly considered Stotts' privy in this matter, this does not comport

with the "relaxed concept of privity that Ohio courts apply for the purposes of res judicata."

*State ex rel. Davis v. Pub. Emps. Retirement Bd*., 881 N.E.2d 294, 301 (Ohio Ct. App. 2007).  To

establish privity, Ohio law does not require even "a contractual or beneficiary relationship."

*Brown v. Dayton*, 730 N.E.2d 958, 962 (Ohio 2000). Rather, as the Ohio Supreme Court has

explained, a "'mutuality of interest, including an identity of desired result,' might … support a

finding of privity." *O'Nest v. DeBartolo Realty Corp*., 862 N.E.2d 803, 804 (Ohio 2007)

(quoting *Brown*, 730 N.E.2d at 962). Such "mutuality" exists only if "the person taking

advantage of the judgment would have been bound by it had the result been the opposite." *Id*.

Here, Stotts and Prokos do not seek "personally tailored relief to fit their unique circumstance or

factual situation" and "their legal interests are the same." *Brown*, 730 N.E.2d at 962 (finding

taxpayers in privity with each other for the purposes of *res judicata* where they sought the same

general disallowance of a local ordinance for the same reasons).  Moreover, had the court of

common pleas ruled that the Zoning Code did not allow adult entertainment uses, Prokos would

---

[9] Under Ohio law, "a prior suit against a municipality has no preclusive effect with respect to municipal employees who are subsequently sued in their 'individual' capacities." *McGuire v. City of Moraine*, 178 F.Supp.2d 882, 891 n.12 (S.D. Ohio 2001) (citing *Perry v. Croucher*, 165 F.3d 28 (Table), 1998 WL 661151 (6th Cir. Aug. 31, 1998)). Accordingly, issue preclusion would not apply to Defendants Hollow, Lavelle, Golzy, and Drabold in their individual capacities. Nevertheless, because Plaintiffs have dismissed all claims against the BZA Defendants in their individual capacities, *see Oral Arg. Tr*., issues already passed upon by the court of common pleas need not be re-litigated here.

17

likewise have been bound by the result. Thus, the Court finds Prokos and Stotts are privies for the purposes of *res judicata*.

Accordingly, with respect to the proper interpretation of the Zoning Code, all three elements of issue preclusion – 1) actual and direct litigation; 2) determination by a court of competent jurisdiction; and 3) privity – have here been satisfied. As such, to the extent that Plaintiffs' Declaratory Judgment or Free Speech claims turn on whether the Zoning Code, on its face, wholly suppresses and/or imposes a content-based restriction on speech, that argument is subject to issue preclusion.

The Court discusses the impact of the above issue preclusion determinations below, in the context of Plaintiffs' individual claims for relief.

### B. Standing

Defendants also argue that Plaintiffs lack standing to bring their claims. Because federal courts have only the power authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto, a plaintiff must establish both constitutional and statutory standing in order for a federal court to have jurisdiction. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 606 (6th Cir. 2007) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 535, 541 (1986). Accordingly, "[i]n evaluating a party's standing, this court must determine whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on *his* behalf." *Id*. (emphasis original) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).

<u>1. Constitutional Standing</u>

A plaintiff must satisfy three elements in order to establish constitutional standing: 1) an injury-in-fact that is a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (citing *Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523 (6th Cir. 2001)).  Each such element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 691 (6th Cir. 2007) (quoting *Lujan*, 504 U.S. at 561).

Here, Defendants assert that Plaintiffs' alleged injuries are not redressable because Stotts did not obtain the requisite State-approved building plans necessary to secure a Use Permit to operate an adult cabaret.  (*Def.'s Mt.*, Doc. 50, 6.)  Thus, Defendants argue, even if Plaintiffs were to succeed in showing that Defendants violated their constitutional rights, they would not be able to secure a Use Permit for the Property.  Viewed another way, Defendants' argument might be cast as a causation problem, i.e., that Plaintiffs' inability to secure a permit is a result, not of Defendants' conduct, but rather Plaintiffs failure to satisfy another, independent permitting requirement.

In making this argument, Defendants rely on the Sixth Circuit's opinion in *Midwest Media Property, L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456 (6th Cir. 2007).  In *Midwest*, Symmes Township denied a billboard permit both because of the commercial content of the billboards and because plaintiffs failed to comply with size and height limitations in the municipal code. *Id.* at 459–60.  Seeking an injunction, damages, and attorneys' fees, Plaintiffs

brought a First Amendment challenge to the township's content restrictions, but did not object to the size and height limitations. *Id.* at 460. The Sixth Circuit therefore held that, even if plaintiffs could show that the content restrictions violated the First Amendment, "'[a]ny injury [plaintiffs] actually suffered from the [challenged regulations] is not redressible because the applications failed to meet the requirements of other statutes and regulations not challenged.'" *Id.* at 461–62.

In the case *sub judice*, unlike *Midwest*, there is a dispute as to whether Defendants actually have a valid independent basis for denying the Plaintiffs' Use Permit. As discussed above, this matter was not previously passed upon or determined in the Second or Third Common Pleas Decisions and, therefore, is not resolved by issue preclusion. The Court therefore examines *de novo* the question of whether Defendants validly denied the First and Second Applications for failure to meet other generally-applicable permitting requirements.

Defendants argue that O.R.C. § 3791.04, which is incorporated by reference into the Athens City Code, *see* A.C.C. § 31.02.02, requires Plaintiffs to secure and submit State-approved building plans before a Use Permit can be issued. That Ohio Revised Code provision provides that, subject to certain exceptions, "[b]efore beginning the construction, erection, or manufacture of any building to which section 3781.06 of the Revised Code applies," a property owner must submit to the relevant municipal, township or county building department State-approved "plans or drawings, specifications, and data prepared for the construction, erection, equipment, alteration, or addition." O.R.C. § 3791.04(A)(1). Thus, the statute imposes a requirement to submit State-approved building plans only before beginning construction, not before requesting or receiving a zoning permit.

Because Plaintiffs do not seek building or construction permits, but merely a Use Permit authorizing the Property to be used as an adult entertainment venue, O.R.C. § 3791.04(A)(1)

does not, on its own, create an independent basis for denying Plaintiffs' Use Permit application. Indeed, the record confirms that, prior to 2008 (including at the time of the First Application was filed), it was not Athens' policy to require such State-Approved building plans before a Use Permit could be issued.  (*See Prazke Aff*., Doc. 50-1 at 2 (affidavit of current Zoning Administrator indicating that, "[i]n 2007, the City of Athens … did issue a Zoning Permit and then a Use/Building Permit after State approved plans were submitted"); *First Application*, Doc. 41-3 (listing the requirements for issuance of a Use Permit and making no reference to State-approved building plans).)

Even if state statute and the municipal code impose no independent obligation to submit State-approved building plans to receive a use permit, the City may impose such an obligation through a valid policy.  By Defendants' own admission, however, no such policy existed at the time of Plaintiffs' First Application. Thus, Plaintiffs' initial failure to submit State-approved building plans could not have been the proximate cause of the denial of the First Application, and any injury traceable to Defendants' conduct could, at minimum, be redressed through money damages.

Whether Plaintiffs can demonstrate a redressable injury traceable to Defendants' subsequent conduct is a separate question. The City's current Zoning Administrator avers that, sometime after 2007, it became the City's policy to "issue a Title 41 Site Plan Review Permit and then a Use Permit after we receive approved drawings from the State of Ohio division of Industrial Compliance Building Regulation Department (State) on commercial structures." (*Prazke Aff*., Doc. 50-1 at 2.) Plaintiffs, however, have presented evidence that, at least once in 2008, the City did issue a Use Permit without requiring submission of State-approved building plans.  (*See* Doc. 41-19, 23–26.)  The City counters that, in that instance, "no construction or

21

minimal construction [was] being performed." (*Paszke Aff.*, Doc. 56-1, 2-3.) The above reflects a genuine dispute of material fact as to whether the City has a neutral, consistent policy of requiring State-approved building plans before granting a Use Permit, or is merely arbitrarily imposing this requirement as pretext to deny Plaintiffs' application. To the extent that Defendants are unable to show a genuine independent basis for denying Plaintiffs' Use Permit, *Midwest* is not a bar to constitutional standing.

Accordingly, the motions of the City Defendants and the BZA Defendants for summary judgment on the basis of constitutional standing are **DENIED**.

### 2. Statutory Standing

Defendants argue that Prokos individually lacks statutory standing to bring Free Speech and Equal Protection claims under 42 U.S.C. § 1983, or the Ohio Constitution.  Specifically, Defendants argue that, because Prokos himself did not file the First and Second Applications, "the City's denial of those applications was not adverse to Prokos, and Prokos was not deprived of any constitutional rights" as required to state a claim under § 1983. (*Def.'s Reply*, Doc. 59 at 2.)  The record reflects, however, that pursuant to the Commercial Lease/Business Agreement with Stotts, (*see* Doc. 41-1), Prokos was to receive up to 40% of the gross revenue of Stotts' adult entertainment business.  Accordingly, like Stotts, Prokos has a direct interest in the adult entertainment business venture. Thus, to the extent that Stotts suffered any constitutional deprivations, Prokos would suffer the same deprivations.

Accordingly, the motions of the City Defendants and the BZA Defendants for summary judgment are **DENIED** as to Prokos' statutory standing.

*C. § 1983 First Amendment (Count I)*

Both Plaintiffs and Defendants move for summary judgment as to the free speech violations alleged in Count I of the Second Amended Complaint.  Plaintiffs state this claim pursuant to 42 U.S.C. § 1983, which imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must establish two elements: (1) the defendant was acting under color of state law; and (2) the offending conduct deprived the plaintiff of rights secured under federal law. *Mezibov v. Allen,* 411 F.3d 712, 717 (6th Cir. 2005) (citing *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir. 1998)).

### 1. Color of State Law and Municipal Liability

There is no dispute here as to whether Pierson and the BZA Defendants, in their official capacities, were acting under color of State law.  Defendants do argue, however, that there is no municipal liability for the constitutional torts alleged in the matter *sub judice*.  Municipal liability under 42 U.S.C. § 1983 attaches where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  Accordingly, a municipality may be sued directly under § 1983 "if they are alleged to have caused a constitutional tort through a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers." *Loreto Development Co., Inc. v. Village of Chardon, Ohio*, 149 F.3d 1183 (Table), at  *2 (6th Cir. 1998) (citing *Monell*, 436 U.S. at 690).  *See also Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010)  ("A § 1983 plaintiff seeking to hold a municipality liable must … allege that the particular injury complained of flowed from the execution of the municipality's

23

policy or custom.")  (citing *Garner v. Memphis Police Dep't,* 8 F.3d 358, 361, 363–64 (6th Cir.1993)).  Applying this rule, the Sixth Circuit has held that a municipality "may be held liable for the acts of its Board of Zoning and Building Appeals due to the fact that municipality conferred final policy making authority on this Board and the fact that the decision of the zoning Board constitutes an action taken under state law." *Loreto Development Co*., 149 F.3d 1183, at *2.

Likewise, here, the City of Athens has conferred on the Board of Zoning Appeals decision-making authority as to the proper application of the Zoning Code.  *See* A.C.C. § 23.07.02 (empowering BZA with original jurisdiction over certain matters, including the "amount of off-street parking required" for uses not specifically mentioned in § 23.10 Table B); § 23.07.02 (empowering BZA with appellate jurisdiction, including the power to hear and decide appeals as to decisions of administrative officials "in the enforcement and interpretation of the provisions of the zoning code"); § 23.04.07(A)(12) (BZA may consider whether use is "of the same general character" as other enumerated uses in the B-3 zone).  The decisions of the BZA are, therefore, properly considered "the execution of the municipality's policy or custom." *Paige*, 614 F.3d at 284.  As such the City of Athens is subject to municipal liability under § 1983 for constitutional torts flowing from the acts of its Board of Zoning Appeals.

### 2. First Amendment Retaliation

Having found the first § 1983 element satisfied, the Court now turns to whether Plaintiffs were deprived of rights secured by federal law.  *Mezibov,* 411 F.3d at 717. Plaintiffs frame their First Amendment claim as one for First Amendment retaliation.[10]  In order to establish First Amendment retaliation, a plaintiff must show that:

---

[10] Defendants argue that this claim was not properly pled because, although the Second Amended Complaint asserted a claim for "Violations of the Right to Freedom of Speech," those pleadings never used the term

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (quoting *Mezibov,* 411 F.3d at 717).

Here, Plaintiffs assert that, in submitting the First and Second Applications, they sought to engage in "protected conduct" in the form of stripping and nude dancing. It is well-established that, while being "'in a state of nudity' is not an inherently expressive condition, nude dancing is expressive conduct and it falls within 'the outer ambit' of the First Amendment's protection." *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 382 (6th Cir. 2008) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000)). Defendants argue that Plaintiffs' claim fails because no expressive conduct has yet occurred. Defendants cannot, however, defeat a free speech claim on the basis that they have so far succeeded in preventing Plaintiffs' expressive conduct.

---

"retaliation" nor referenced the specific elements of a First Amendment retaliation claim. Defendant cites *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005), for the proposition that the liberal notice-pleading standard applicable at motion to dismiss stage does not apply to a motion for summary judgment. In *Tucker*, the Sixth Circuit considered whether, where a complaint asserted only claims to compel arbitration of a union grievance, a plaintiff could sustain a promissory estoppel claim raised for the first time in response to the defendant's summary judgment motion. *Tucker* held that, at that late date, once discovery was complete, plaintiff could not assert a new claim because to do otherwise would subject the defendant to unfair surprise.

Here, in contrast, Plaintiffs do not assert not an entirely different claim or cause of action, but merely specify their theory of liability as to the alleged violations of § 1983 and the right to free speech. Specifically, in their Second Amended Complaint, Plaintiffs pled that Defendants "den[ied] Plaintiffs the right to engage in protected in the manner as requested in Plaintiffs' First and Second Applications," and that "the denial of the First and Second Applications denied to Plaintiffs a right to expression and speech that is secured by the Constitution and laws of the United States." (*Sec. Amen. Compl.*, Doc. 22, 13.) Furthermore, the allegations in the Second Amended Complaint indicate that Defendants' conduct in denying the applications was "based entirely on the content of the protected speech that Plaintiffs proposed to offer at the Property." (*Id.* at 7.) Thus, Defendants are not without the benefit of discovery as to whether Plaintiffs engaged in protected speech, whether Defendants took any adverse action to restrict such speech, and the motives underlying Defendants' conduct. Moreover, Plaintiffs asserted this formulation of their First Amendment claims not in their opposition to Defendants' summary judgment motion but in Plaintiffs' own motion for summary judgment. Based on these facts, the Court finds that Defendants are not subject to any unfair surprise. As such, the Court will consider Plaintiffs First Amendment claim under the First Amendment retaliation framework.

The Sixth Circuit has held that "an official action will be deemed 'adverse' only if it could 'deter a person of ordinary firmness' from the exercise of the right at stake." *Bell v. Johnson*, 308 F.3d 594, 503 (6th Cir. 2002) (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 396 (6th Cir.1999) (en banc)). Thus, although the "'[effect on freedom of speech] need not be great in order to be actionable …[i]t would trivialize the First Amendment' to allow plaintiffs to bring First Amendment retaliation claims for *any* adverse action no matter how minor." *Id*. (alterations and emphasis original) (quoting *Thaddeus-X*, 175 F.3d at 397). Significantly, under the law of the Sixth Circuit, "[w]hether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Id*. (citing *Thaddeus-X*, 175 F.3d at 398–99; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir. 1999)).

Here, Plaintiffs assert that Defendants undertook adverse actions against them by denying the First and Second Applications. Specifically, Plaintiffs have presented evidence that Defendants refused to act timely on the First Application within 30 days, as purportedly required by A.C.C. § 23.06.02(G), repeatedly denied their permit applications in the First, Second and Third BZA Decisions (despite the fact that adult entertainment was a permitted use in the B-3 Zone), and refused to grant the Use Permit on remand from the Second Common Pleas decision based on an allegedly pretextual state-approved building plan requirement. In addition, Plaintiffs have presented evidence that Defendants' actions have prevented them from opening or operating their business, and thus prevented the Property from generating income for nearly six years. Defendants counter that – because zoning permits applications are routinely denied, adjusted, and resubmitted – there is no reason to think that that the denial of a zoning application would deter a person of ordinary firmness from resubmitting a zoning application in the future.

In *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th Cir. 2010), the Sixth Circuit considered whether – among other alleged acts – a city official's purposeful delay in granting permit renewals and other acts that rendered the plaintiffs "ineligible for permit renewal" could deter a person of ordinary firmness from exercising his right to petition local government officials. Viewing the conflicting facts in the light most favorable to the plaintiffs, the *Holzemer* Court concluded that a citizen might be deterred from engaging in protected conduct if it "would lead to a failure to obtain necessary renewal permits and the *de facto* closure of their business." *Id*. at 525 (explaining that, although plaintiff was not entitled to renewal, it was not within the government's discretion to "deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech…. [because] his exercise of those freedoms would in effect be penalized and inhibited") (quoting *Rutan v. Republican Party*, 497 U.S. 62, 72 (1990)). In addition, in *Fritz v. Charter Tp. Of Comstock*, 592 F.3d 718, 728-29 (6th Cir. 2010), the Sixth Circuit determined that the Zoning Board of Appeals' denial of a plaintiff's requests for a signage and zoning variance – which plaintiff alleged impacted her ability to conduct her business in the manner of her choosing and threatened her economic livelihood – "alone [wa]s probably sufficient state a claim of retaliation inasmuch as the possibility of a zoning variance or signage variance necessary for operating a business as planned would deter a person of ordinary firmness from exercising First Amendment Rights."

Likewise, here the Court finds that there is evidence in the record to support Plaintiffs' position that the repeated delays and refusals to grant Use Permit Applications would deter a person of ordinary firmness from establishing an adult entertainment establishment. Nevertheless, the question of whether Defendants' conduct in that regard sufficiently rises to the

27

level of an "adverse action" is a disputed question of material fact that is properly resolved by a jury. *See Bell*, 308 F.3d at 503 (citing *Thaddeus-X*, 175 F.3d at 398–99).

The third prong of a First Amendment retaliation claim requires "a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394.  Analyzing motive in a First Amendment retaliation claim utilizes a burden-shifting approach. *Id*. at 399.  First a plaintiff must establish that his or her "protected conduct was a motivating factor behind any harm." *Id*.  At summary judgment stage, this hurdle is not insubstantial: "bare allegations of malice would not suffice to establish a constitutional claim." *Id*. (quoting *Crawford–El v. Britton,* 523 U.S. 574, 588 (1998)). Once the plaintiff met this burden, the burden of production shifts to the defendant. *Id*. (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)).  Specifically, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id*.

Here, Plaintiffs have presented evidence that Defendants' denials and delays related Plaintiffs' First and Second Applications were motivated by Defendants' opposition to the content of the expressive conduct proposed by the applications, *i.e*. nude and erotic dancing.   In particular, Plaintiffs point to the extensive transcripts from the First, Second, and Third BZA Hearings, at which various BZA members made reference to the immorality or impropriety of an adult entertainment venue.  Although Defendants counter that these transcripts also show other bases for the BZA's decisions, Plaintiffs have sufficiently created a genuine issue of material fact as to whether the denial of the Use Permits was motived by Defendants' objections to the content of Plaintiffs' expressive activity.

Because Plaintiffs have met their burden in this regard, the burden shifts to Defendants to show that they would have taken the same action in the absence of the protected activity. *Thaddeus-X*, 175 F.3d at 394.  Defendants argue that Plaintiffs were not entitled to a Use Permit because the First and Second Applications did not meet various generally-applicable zoning requirements, including requirements related to the designation of parking spaces and the submission of State-approved building plans.  As shown above, however, the question of whether Defendants had a valid independent basis for denying Plaintiffs' applications is a disputed issue of material fact. As such, Defendants have not made the requisite showing necessary to prevail on summary judgment as to Plaintiffs' First Amendment retaliation claim. Likewise, because the record is disputed as to whether Defendants' proffered reasons for denying Plaintiffs' application are merely pretextual, Plaintiffs are also not entitled to prevail on summary judgment.

Based on the foregoing, the City Defendants' motion for summary on Count I of the Second Amended Complaint is **DENIED**, the BZA Defendants' motion for summary judgment on Count I is **DENIED**, and Plaintiff's motion for summary judgment on Count I is **DENIED**.

### D. § 1983 Equal Protection (Count II)

Defendants also move for summary judgment as to the equal protection violations alleged in Count II of the Second Amended Complaint.  Plaintiffs assert this claim pursuant to 42 U.S.C. § 1983, which requires both that: (1) the defendant was acting under color of state law; and (2) the offending conduct deprived the plaintiff of rights secured under federal law. *Mezibov,* 411 F.3d at 717 (citing *Bloch,* 156 F.3d at 677).

There is no dispute as to whether Pierson and the BZA Defendants acted under color of state law when acting in their official capacities.  In addition, although Defendants again

challenge the propriety of municipal liability under § 1983, the Court now dismisses this objection for the same reasons cited above. Accordingly, Plaintiffs has satisfied the first element of their § 1983 Equal Protection claim.

The Court therefore now turns to whether Defendants' conduct deprived Plaintiffs of rights secured by federal law. Plaintiffs allege that Defendants violated their Fourteenth Amendment right to equal protection of the laws in failing to automatically grant the First Application after 30 days pursuant to A.C.C. § 23.06.02(G), while treating other, similarly situated use permit applications differently.  As discussed above, this Court's consideration of this matter is not barred by *res judicata* because the Plaintiffs' equal protection claim was subject to an *England* reservation, and there was no collateral estoppel as to whether Defendants' timely acted on the First Application.

The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  Thus, the Sixth Circuit has explained that even a "class of one" may bring an equal protection claim when the state has treated then differently from others similarly situated without a rational basis for doing so. *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005).  This "rational basis" test "means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'" *Id*. at 711 (alterations original) (quoting *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 84 (2000)).  This Court has explained that, under the "class of one" theory of equal protection, a plaintiff "may

demonstrate that government action lacks a rational basis either by negating every conceivable basis that might support the government action or by showing that the challenged action was motivated by animus or ill-will."  *Bench Billboard Co. v. City of Cincinnati*, 717 F.Supp.2d 771, 786 (S.D. Ohio 2010) (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005)).

Here, Plaintiffs equal protection claim centers on Defendants' allegedly inconsistent application of A.C.C. § 23.06.02(G), which provides:

> **23.06.02 (G).** Administration schedule: The zoning administrator shall act upon all such applications on which he is authorized to act by the provisions of the zoning code within 30 days after they are filed in full compliance with all the applicable requirements. He shall either issue a zoning permit within the 30 days or shall notify the applicant in writing of his refusal of such certificate and the reasons therefore. Failure to notify the applicant in case of such refusal within 30 days shall entitle the applicant to a zoning permit, unless the applicant consents to an extension of time.

(*Athens Zoning Code*, Doc. 41-2.)  Specifically, Plaintiffs assert that the First Application, filed on December 17, 2007, was not "acted upon" by the BZA until the March 11, 2008 hearing, and thus should have been automatically granted 30 days after its filing.  In addition, Plaintiffs present evidence that a third party, Mr. DeBeck, applied for a permit and was granted one when his application was neither granted nor denied by the City within 30 days. (*See* Doc. 41-19, 23–26.)

Defendants assert that Plaintiffs' equal protection claim fails for three distinct reasons. First, Defendants assert a "rational basis" for their conduct in that the First Application was not "filed in full compliance with all the applicable requirements" and, therefore, was not subject to 30-day timeline imposed by A.C.C. § 23.06.02(G).  In particular, Defendants argue that the First Application did not comport with filing requirements because the parking provided for was inadequate under the Zoning Code, and Plaintiffs failed to provide State-approved building

plans.  Again, there is no issue preclusion here as to whether Plaintiffs' application failed to meet

certain generally-applicable building requirements.  Moreover, as discussed above, it is

undisputed that, in 2007, it was not Athens' policy to require state-approved building plans as a

condition of granting a Zoning Certification/Use Permit. (*See Prazke Aff.*, Doc. 50-1 at 2 ("[i]n

2007, the City of Athens … did issue a Zoning Permit and then a Use/Building Permit after State

approved plans were submitted"); *First Application*, Doc. 41-3 (listing the requirements for

issuance of a Use Permit and making no reference to State-approved building plans).) There is,

however, a dispute of material fact as to whether the First Application fully complied with the

parking requirements in the Zoning Code.  This matter was never decided by the BZA or the

court of common pleas. Moreover, as discussed above, there are material disputes as to whether

Defendants' conduct was "motivated by animus or ill-will" toward the purposed adult

entertainment use. *Bench Billboard Co.*, 717 F.Supp.2d at 786. Accordingly, there remain

genuine issues of fact as to whether Defendant's had a rational basis for denying the First

Application.

Defendants next argue that the Zoning Administrator did "act upon" the First Application

within 30 days in the form of Pierson's July 15, 2008 written response.  That response stated, in

relevant part:

> ...I am unable to determine if the proposed use and the number of parking spaces
> is permitted under Athens City Code, Title 23, Zoning Code. Therefore, in
> accordance with the Athens City Code Sections 23.04.07(A)(12) and 23.07.02(C),
> I am referring this matter to the Athens City Board of Zoning Appeals.

(*Id*. at ¶ 11, Ex. 4.)  Plaintiffs contend that such a response does not constitute "acting upon" an

application, because it was "only a demurral" that did not grant or deny the application. (Pl.'s

Response, Doc. 56, 8.)

In discussing the general duty of administrative officials timely to "act upon" permit applications, the Ohio Supreme Court has used that phrase to refer to the actual grant or denial of an application.  *State ex rel. Federal Homes Properties, Inc. v. Singer*, 223 N.E.2d 824 (Ohio 1967) (appeal pursuant O.R.C. § 2506.01 is not ripe where administrative official refuses to "act upon" permit application and has not actually issued a denial); *Great Atlantic & Pac. Tea Co. v. Cook*, 240 N.E.2d 114 (Ohio Ct. Com. Pleas 1968) (discussing duty to of administrative officials to "timely act upon an application" as the duty to grant or deny an permit application) (citing *Singer*, 223 N.E.2d 824)). Furthermore, where local ordinances require that a local regulatory body "act upon" an application for a permit within a certain timeframe, Ohio courts have interpreted this language to require that the body at issue actually grant or deny an application. *See State ex rel. Beach, L.P. v. Vilkas*, No. 86221, 2005-Ohio-4851, 2005 WL 2100580, at *2, 5 (Ohio Ct. App. Aug. 29, 2005) (ordering Cleveland Landmarks Commission either to approve or disapprove pending permit applications pursuant to ordinance requiring Commissioner to "act upon an application for a permit without unreasonable or unnecessary delay").

This Court likewise concludes that the Athens City Code's imposition of a duty to "act upon all [permit] applications … within 30 days," A.C.C. § 23.06.02(G), must mean a duty to actually grant or deny an application within that timeframe. This interpretation is supported by the subsequent language of the Code, which describes the Zoning Administrator's duty in the following binary terms: "He shall *either issue* a zoning permit within the 30 days *or* shall notify the applicant in writing of his *refusal* of such certificate and the reasons therefore." *Id.* (emphasis added). Here, the record reflects that Pierson's January 15, 2008 letter did not "refuse" the First Application, but rather referred the matter to be decided by the BZA.  Hence, if a fact-finder determines that the First Application was in compliance with all filing requirements, Pierson's

failure to issue or refuse the requested Use Permit "within 30 days … [would] entitle [Stotts] to a zoning permit." *Id.*

Finally, Defendants argue that Plaintiffs have not satisfied the threshold inquiry of showing that they were treated differently than other entities that were "similarly situated in all respects." *See Bench Billboard*, 717 F.Supp.2d at 787 (citing *Taylor Acquisitions, L.L.C. v. City of Taylor,* 313 Fed.Appx. 826, 836 (6th Cir. 2009)). Specifically, Defendants argue that the First Application was not "similarly situated" to DeBeck's Use Permit Application because DeBeck's application was complete and received no written response of any kind from the Zoning Administrator within the prescribed 30 day period. Pierson's January 15 response letter does constitute "act[ion] upon" the First Application as required by A.C.C. § 23.06.02(G). Accordingly, the absence of any kind of written response to the DeBeck Application is a distinction without a difference. Thus, the question of whether the First Application was "similarly situated" to the DeBeck Application turns on whether the former was in "full compliance" with all generally applicable filing requirements. This, however, is a disputed question of material fact. The Court therefore cannot at this juncture determine whether Plaintiffs were "similarly situated in all material respects" to DeBeck.

Based on the above, the Court finds that there are genuine issues of material fact that preclude summary judgment as to Plaintiffs' equal protection claim. The City and BZA Defendants' motions for summary judgment as to Count II of the Second Amended Complaint are, therefore, **DENIED**.

### E. Regulatory Takings (Count III)

Both Plaintiffs and Defendants move for summary judgment as to Count III of the Second Amended Complaint, which asserts that Defendants' denial of the First and Second

Applications constitutes a regulatory taking. Defendants argue that Plaintiffs' regulatory takings claim is not ripe.

As the Supreme Court explained in *Williamson v. County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985), the Takings Clause of the Fifth Amendment does not prohibit the government from taking private property, but rather prohibits the government from taking private property *without just compensation*. A takings claim, thus, is not ripe for review unless a property owner is denied just compensation. *Id.* ("Because the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied."). Therefore, "if a State provides an adequate procedure for seeking just compensation, [a] property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id*.

In *Coles v. Granville*, 448 F.3d 853 (6th Cir. 2006), the Sixth Circuit held that Ohio has a "reasonable, certain, and adequate provision for obtaining compensation." *Id*. at 861. Specifically, Ohio law provides a statutory mechanism under which a government agency seeking to take property is under a duty to bring an appropriation proceeding against the landowner. *Id*. (citing Ohio Rev. Code §§163.01-163.62; *Shemo v. City of Mayfield Heights*, 765 N.E.2d 345 (Ohio 2002)). Furthermore, an individual "who believes that his property has been taken in the absence of such an appropriation proceeding may initiate a mandamus action to force the government actor into the correct appropriation proceeding." *Id.; see also BSW Development Group v. City of Dayton,* 699 N.E.2d 1271, 1274 (Ohio 1998) (in regulatory takings case, holding that "[m]andamus is the appropriate vehicle for compelling appropriation proceedings by public authorities where an involuntary taking of private property is alleged"); *Duncan v. City of Mentor City Council*, 826 N.E.2d 832 (Ohio 2005) (mandamus action

considering a regulatory taking). Accordingly, a federal takings claim – including a regulatory takings claim – is not ripe until the property owner has undertaken such a mandamus action and been denied just compensation.

Plaintiffs argue, based on the Sixth Circuit's holding in *Kruse v. Village of Chagrin Falls*, 74 F.3d 694 (6th Cir. 1996), that the "Dickensian formalities" of Ohio's mandamus mechanism – and the attendant uncertainty as to whether mandamus is appropriate in various contexts – render it an inadequate procedure for seeking just compensation as a matter of law.  In *Coles*, however, the Sixth Circuit expressly overruled *Kruse*, explaining: "[t]oday, ten years after the *Kruse* decision, this uncertainty has all but disappeared, as the Ohio courts have accepted a mandamus action as the appropriate approach for a plaintiff alleging a taking without just compensation." *Coles*, 448 F.3d at 863. Having determined that the concerns cited in *Kruse* were no longer present, *Coles* held that recourse to Ohio's mandamus procedure was a condition precedent for the ripeness of a federal takings action against an Ohio state or local entity.  *Id*. at 865.

There is no dispute that Plaintiffs have failed to request mandamus from the state.  Their federal takings claims are, therefore, not yet ripe for review by this Court.  Thus, the City and BZA Defendants' motions for summary judgment on Count III of the Second Amended Complaint are **GRANTED**, and Plaintiffs' motion as to Count III is **DENIED**.

### F. Declaratory Judgment (Count IV)

Plaintiffs' claim for declaratory relief asks this Court to find that Zoning Code §§ 23.04.07, 23.04.06, and all other provisions of the Zoning Code applicable to the Property to be unconstitutional on their face and as applied under the First, Fourth, Fifth, and Fourteenth Amendments.  The Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides federal courts with the authority to declare the rights and other legal relations of any interested party

36

only in case of an actual controversy.  In addition, the "case or controversy" jurisdictional requirement of Article III of the United States Constitution "applies to declaratory judgment actions as well as to other cases of a more conventional nature." *Safeco Ins. Co, v. Lewis*, No. 4:07-cv-3709, 2008 WL 207705 (N.D. Ohio Jan. 24, 2008) (quoting *Detroit, Toledo & Ironton R.R. Co. v. Consolidated Rail Corp.,* 767 F.2d 274, 279 (6th Cir. 1985)).

When determining whether an actual controversy exists, the appropriate inquiry is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Detroit, Toledo & Ironton R.R. Co.,* 767 F.2d at 279 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941)). Stated differently, to be justiciable, a controversy "must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Hillard v. First Financial Ins. Co.,* 968 F.2d 1214, 1992 WL 164998, at *2 (6th Cir. 1992) (quoting *Rowan Companies, Inc. v. Griffin,* 876 F.2d 26, 28 (5th Cir. 1989)). Ultimately, "if there is no case or controversy, this court lacks subject matter jurisdiction over these proceedings." *Columbus Community Cable Access, Inc. v. Luken*, 923 F.Supp. 1096, 1028 (S.D. Ohio 1996) (citing *Michigan v. Meese,* 853 F.2d 395, 397 (6th Cir. 1988)).

In the wake of the Second Common Pleas Decision, Defendants no longer seek deny Plaintiffs' application on the basis of that Zoning Code §§ 23.04.07 and 23.04.06 do not permit Plaintiffs' adult entertainment venues in areas zoned B-3.  Nevertheless, there remains a live controversy between the parties, because Plaintiffs seek damages pursuant to § 1983 for Defendants' alleged conduct in impermissibly applying the Zoning Code to deny Plaintiffs equal

protection under the laws and the right to engage in free speech/expression. As indicated above, there genuine questions of material fact which preclude summary judgment on whether the Zoning Code is unconstitutional as applied.  Defendants' motions for summary judgment on Count IV are, therefore, **DENIED** with respect to Plaintiffs' as-applied challenge to the Zoning Code.

The Second Common Pleas Decision does, however, have preclusive effect as to a critical factual predicate of Plaintiffs' facial challenge to §§ 23.04.07 and 23.04.06 of the Zoning Code.  Specifically, the Second Common Pleas Decision decided that nude dancing and adult entertainment establishments were among the permitted in areas with a B-3 Zoning designation. The Zoning Code, therefore, does not specifically regulate adult entertainment or sexually-oriented businesses.  A facial First Amendment challenge to a statute or ordinance requires that a law give a government official or agency substantial power to discriminate based on the content or viewpoint of speech. *City of Lakewood v. Plain Dealer Publishing Co*., 486 U.S. 750, 759 (1988).  Where the law at issue does not actually regulate expression, a facial challenge will not lie. *Id*. Accordingly, Plaintiffs cannot sustain a facial challenge to the Zoning Code as an impermissible content-based restriction on speech or expression.  Defendants' motions for summary judgment on Count IV are, therefore, **GRANTED** with respect to Plaintiffs' facial challenge to the Zoning Code.

Based on the foregoing, the City and BZA Defendants' motions for summary judgment as to Count IV of the Second Amended Complaint are **GRANTED** in part and **DENIED** in part.

### G. Ohio Free Speech (Count V)

Defendants also request summary judgment on Count V of the Second Amended Complaint, which asserts violations of the right to free speech under Article I § 11 of the Ohio

Constitution.  Defendants so move only on the grounds that Plaintiffs are not "entitled to exercise their right to free speech via a business that does not satisfy generally-applicable regulations." (*Def.'s Mt.*, Doc. 50, 13) (emphasis omitted). This Court has already decided that this matter was not resolved by the Third Common Pleas Decision and is therefore not subject to issue preclusion.  In addition, this Court determined, above, that the question of whether Defendants had a valid independent basis for denying Plaintiffs' applications is a disputed issue of material fact.  Thus, the City and BZA Defendants' motion for summary judgment on Count V of the Second Amended Complaint is **DENIED**.

## IV. CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Partial Summary Judgment, (Doc. 48), is **DENIED**; the City Defendants' Motion for Summary Judgment, (Doc. 50), is **GRANTED** in part and **DENIED** in part; and the BZA Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  All claims against Defendants Hollow, Lavelle, Golzy, and Drabold in their individual capacities are **DISMISSED**.

**IT IS SO ORDERED.**

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: September 30, 2013**